U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**Signed September 28, 2006**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CAMERON BARRETT SHARPE, | § | CASE NO. 05-84378-SGJ-7 |
|     DEBTOR. | § | |
| | § | |
| | § | |
| SUSAN BAKER, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3208 |
| | § | |
| CAMERON BARRETT SHARPE, | § | |
|     DEFENDANT. | § | |

**MEMORANDUM OPINION**

I.

**INTRODUCTION**

Before this court is the Adversary Complaint Objecting to
Dischargeability of Debt Under 11 U.S.C. § 523 (the "Complaint")
brought by Susan Baker (the "Plaintiff" or "Ms. Baker"),
Defendant's Original Answer, Affirmative Defenses, and Original
Counterclaim (the "Answer and Counterclaim") filed by Cameron

Barrett Sharpe (the "Defendant" or "Mr. Sharpe"), and the Plaintiff's Answer to Counter Claim [sic] of Defendant Cameron Barrett Sharpe (the "Answer to Counterclaim").  This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I).  This memorandum opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  Where appropriate, a finding of fact will be construed as a conclusion of law and vice versa.

II.
FINDINGS OF FACT

**A. Procedural Matters**

Docket call of this case was on July 10, 2006.  Trial of this matter was held before this court on July 17, 2006.  The Plaintiff appeared through counsel, while the Defendant appeared *pro se*.  The Defendant filed his voluntary chapter 7 petition in bankruptcy on October 13, 2005.  The Complaint was filed on March 13, 2006.  Defendant filed his Answer and Counterclaim on April 13, 2006, and Plaintiff filed her Answer to Counterclaim on May 26, 2006.

Two preliminary motions concerning evidence were brought by the Plaintiff.  First, the Plaintiff filed her Motion to Deem Plaintiff's Request for Admissions (Admitted) and Request for Expedited Hearing (the "Admissions Motion").  Plaintiff asserted

-2-

that because the Defendant did not respond to requests for
admissions served upon Defendant at his last known address on
June 7, 2006, that such matters should be deemed admitted
pursuant to Fed. R. Civ. P. 36, made applicable in this
proceeding by Fed. R. Bankr. P. 7036. During argument of the
Admissions Motion, it was revealed that Defendant's last known
address as reflected by this court's docket was not, in fact, his
current address. Plaintiff's counsel expressed that it had been
very difficult to locate Defendant in order to serve him with
discovery and pleadings. On the record, the Defendant announced
a new service address and the court deemed such announcement as
an oral change of address by the debtor in this proceeding and in
the main bankruptcy case and announced that the court's records
would be changed accordingly. The court, however, denied
Plaintiff's Admissions Motion because the request for admissions
had been sent to Defendant's last known address after the
discovery cut-off date as set forth in this court's Order
Regarding Adversary Proceeding Trial Setting and Alternative
Scheduling Order (the "Scheduling Order"). Plaintiff's counsel
argued that the difficulty in obtaining a workable service
address for the Defendant caused the delay in serving the request
for admissions. While the court sympathized with Plaintiff's
difficulty, the court opined on the record, and restates such
opinion here, that the Plaintiff should have come to the court as

-3-

soon as such difficulty with service became apparent to request relief from this court, rather than just ignore the deadlines set forth in the court's Scheduling Order.

Next, the Plaintiff also filed a Motion to Exclude Testimony from Debtor or Debtor's Witnesses, Exhibits and Evidence (the "Motion to Exclude") asserting that, because the Defendant failed to file a witness and exhibit list or otherwise identify witnesses and exchange exhibits at least 15 days prior to docket call of the case as required by this court's Scheduling Order, such evidence should be excluded.  Consistent with the court's ruling on the Admissions Motions strictly enforcing the deadlines set forth in the Scheduling Order, the court granted the Motion to Exclude finding that because the Defendant had failed to comply with the Scheduling Order, he would not be permitted to put on evidence with regard to his case in chief, including his counterclaims.  The Defendant was, however, permitted to object during the Plaintiff's case in chief, to cross examine her witnesses, and to put on any rebuttal evidence he might have to present to the court.

## B.  Factual Background

The matter before the court is essentially a dispute between two parties, former friends, regarding various loans in the aggregate sum of $150,000 made by Ms. Baker to Mr. Sharpe in 2005.  It was the undisputed testimony of the parties that Ms.

-4-

Baker and Mr. Sharpe met sometime in December of 2004, shortly after Ms. Baker's divorce had become final, and that they became fast friends.  Both parties, in fact, agreed that at one point their relationship could be fairly characterized as that of "best friends."  During the period of their friendship, Ms. Baker and Mr. Sharpe spent a large amount of time together and spoke to each other most every day on the telephone.

The court notes that, at trial, there was testimony about the character, behavior, or mental state or status of the Defendant and/or of the Plaintiff, some of which was inflammatory and of little probative value.  To the extent the testimony was inflammatory, the court has disregarded such testimony regarding both parties as being more prejudicial than probative.

Ms. Baker is, generally, a sophisticated women.  She testified that she has a high school degree, an undergraduate degree and a Master's degree.  Ms. Baker had been married for 25 years upon her divorce and is the mother of three adult children. Her divorce from her one-and-only husband left her in a comfortable financial position, although she testified that she never informed Mr. Sharpe that she was well-off.

Mr. Sharpe's educational background was not defined at trial, but it is clear from his testimony that he had been involved for some time in various types of business speculation. Mr. Sharpe did testify on cross that, during the time frame in

-5-

question, he had had drug and alcohol abuse problems and that he had not, as of the time of trial, been able to overcome such problems.

In 2005, Mr. Sharpe and Ms. Baker were both involved in a business known as UltimateMatch.com, which, Mr. Sharpe testified, was a dating service/direct marketing enterprise in which revenues were obtained both from customers who used the dating service and through distributors who sold the business to other customers and distributors.[1] Mr. Sharpe likened the business model of the company to that of Mary Kay, Inc. There is some dispute as to whether Mr. Sharpe ever owned any part of UltimateMatch.com. Ms. Baker testified that Mr. Sharpe represented to her that he owned 10% of UltimateMatch.com and said that he would give to Ms. Baker 3% of the company. Mr. Sharpe testified that such interest was a "speculative interest." Mr. Sharpe maintains that, as to the portion of UltimateMatch.com offered to Ms. Baker, he was the owner, though he has no documentation to support such an assertion. At any rate, no writing was presented by either party concerning the ownership interest Mr. Sharpe has or had in UltimateMatch.com or regarding any such conveyance of any such interest in the company from Mr. Sharpe to Ms. Baker. The only document before this court

---

[1]Mr. Sharpe had a business associate in UltimateMatch.com named Steve Smith, who was not present in the courtroom during the trial.

concerning Mr. Sharpe's ownership interest in UltimateMatch.com is Mr. Sharpe's Schedule B, which lists "7% of Ultimate Match, a part of SMUM, LP – contested and unliquidated."[2]

The parties agree that Mr. Sharpe was fired from his position with UltimateMatch.com, whatever that position may have been, in September of 2005. Mr. Sharpe's Schedule I reflects that his occupation is that of "independent sales" and that he was unemployed at the time of filing bankruptcy.

During the first part of 2005, Ms. Baker made two loans to Mr. Sharpe evidenced by promissory notes, and made several other loans not so documented. All of such loans, the parties agree, aggregate to $150,000. The loans were made starting late 2004 through August or September of 2005. Mr. Sharpe does not dispute that he took such loans and, in fact, scheduled Ms. Baker as an unsecured creditor in the amount of $175,000 describing the nature of her debt as a "personal loan." Ms. Baker is also listed on Mr. Sharpe's Schedule D as the holder of a purchase money security interest in the amount of $13,500 in a 2.87 carat diamond ring.

The first promissory note is dated March 5, 2005 and is in

_____

[2]On cross, Mr. Sharpe testified that he received a loan from his uncle in the amount of $10,000 in exchange for 10% in another venture, Extreme Wealth. Mr. Sharpe testified that he entices people to invest in his businesses by offering 10% interest in such companies and that it usually worked quite well for him. No writing was presented regarding this arrangement either.

the amount of $25,000 at 4.25% interest. Ms. Baker testified, and Mr. Sharpe agreed, that the funds conveyed pursuant to the first promissory note were to be used to fly people into Dallas, Texas and Austin, Texas in order to interest those people in becoming involved with the up-and-coming business, UltimateMatch.com. Mr. Sharpe testified that the funds were actually used to fly people around the country, build the business, and for living expenses about which he was unable to elaborate. Monthly payments on the first promissory note in the amount of $2,000 per month were to begin on July 15, 2005 with the loan to be paid in full by April 15, 2006.

Ms. Baker entered into a second promissory note dated May 13, 2005 with Mr. Sharpe in the amount of $70,000 at no interest with a maturity date of "February 13, 2006, unless sooner demanded." The second promissory note does not specify when payments were to begin apart from the maturity date of February 13, 2006 and Ms. Baker's right to demand payment sooner than February 13, 2006. There was no testimony from either Ms. Baker or Mr. Sharpe as to how the funds from the second promissory note were to be used. Ms. Baker did testify that the only time she expected repayment of the note was after Mr. Sharpe's divorce was final.[3] Regarding how Mr. Sharpe intended to pay the note if Ms.

---

[3]There was testimony that Mr. Sharpe was in the midst of his second divorce during the time frame of one or more of the loans in question.

Baker demanded repayment sooner than February 13, 2006, Mr.
Sharpe testified that he assumed that he could borrow the funds
from his business associate, Steve Smith, but he had no formal
arrangement with Mr. Smith for such a loan.

The other, undocumented loans are rather amorphous.  There
was evidence presented that Ms. Baker had loaned $13,500 to Mr.
Sharpe in September of 2005[4] to purchase an engagement ring for
Mr. Sharpe's then-fiancee, a woman named Heather Jacks.  But Ms.
Baker acknowledged that, although Mr. Sharpe has not repaid her
the $13,500, he had surrendered the ring to her.  There was also
testimony that she purchased a Louis Vuitton purse on behalf of
Mr. Sharpe for a Laurie Patrone[5] in the amount of $996, but,
again, Ms. Baker acknowledged that the purse had been returned to
her.  Ms. Baker also testified that she had paid a $1,500+
breakfast bill in connection with an UltimateMatch.com business
meeting because Mr. Sharpe represented he had left his credit
card at home.  She said that the purchase of the purse and the
payment for the breakfast were made during the time when Mr.
Sharpe also represented that he had the funds to repay her.  Ms.

_____

[4]Plaintiff's Exhibit 4 shows a check in the amount of
$13,500 from Susan Baker written for cash, which Ms. Baker
testified was for the purchase of a diamond ring for Mr. Sharpe's
then-fiancee.  Exhibit 4 also has the notation, "$ I gave Cameron
in cash for Heathers [sic] diamond ring."  Ms. Jacks was not in
the courtroom at the time of trial.

[5]Ms. Patrone was not present in the courtroom at the time of
trial.

Baker also testified that she paid for Google.com advertising for Mr. Sharpe's website in the amount of approximately $1,500. She testified that those funds were supposed to go to advertise her own website with Google.com, but that Mr. Sharpe converted the funds to advertise his website instead. Mr. Sharpe asserts that the use of those funds for advertising for his website were just a simple mistake that he did not intend to occur.

Ms. Baker also testified that she permitted Mr. Sharpe to drive her vehicle and that some months he paid her for the use of the vehicle and some months he did not. There was testimony that he put a radar detector in the car, but also that the car was returned to her with a broken headlight, which Ms. Baker was required to repair herself. Ms. Baker testified that she had no idea as to Mr. Sharpe's financial condition – specifically, she had no idea that his house had been foreclosed upon and that he had had three vehicles repossessed – prior to making the loans to him. She testified that it was not until August of 2005 that she became aware of his financial condition, when he told her that he did not have any money and that he intended to file bankruptcy.

There was also testimony that Mr. Sharpe had, for some months, been preparing to file for bankruptcy protection. Mr. Sharpe's former office assistant, Eileen Wolkowitz, testified that Mr. Sharpe maintained a file into which bills were placed, which at her deposition she had referred to as a "bankruptcy

file." She testified that Mr. Sharpe would instruct her not to pay certain bills as they came due. Ms. Wolkowitz also testified that there were times when she wanted to pay bills, but Mr. Sharpe would not let her. Ms. Wolkowitz testified that she and Mr. Sharpe did discuss the possibility that he might file for bankruptcy protection and further testified that the bankruptcy filing seemed like an inevitability to her. But she also testified that Mr. Sharpe never said that he was definitely going to file bankruptcy. An e-mail from Steve Smith to Mr. Sharpe, Plaintiff's Exhibit 8, reflects that at least as of September 6, 2005, Mr. Sharpe had been planning to file bankruptcy.

The parties agree that Mr. Sharpe dressed expensively at the time the loans were made, wearing custom-made suits and designer label clothes and accessories, and that he continues to so clothe himself today. Mr. Sharpe characterized his manner of dress as "dressing for success." Ms. Baker testified that Mr. Sharpe's manner of dress led her to believe that he was a wealthy man. She also testified that based upon his demeanor and appearance she thought he had money. Ms. Wolkowitz also testified that Mr. Sharpe led a lifestyle that led her to believe that he was a successful, wealthy person and that she believed Mr. Sharpe intended to lead people to believe that he was a wealthy person. There was testimony that Mr. Sharpe utilized an American Express card, which had his name on it, but was to an account belonging

-11-

to a Johnny Vaughn,[6] a friend of Mr. Sharpe, to make many extravagant purchases.  Mr. Sharpe stipulated to the fact that high-dollar charges reflected on an American Express bill, Plaintiff's Exhibit 7, were his charges.

Next, Ms. Wolkowitz testified that, over the 11 years that she has known Mr. Sharpe, she has known him to make a lot of money and to have lost a lot of money.  She also testified that his disposition is such that he often attempts and genuinely desires to do more than he is financially capable of doing.[7] And, indeed, what is remarkable about Mr. Sharpe's testimony throughout the trial, though convoluted and often confused, is the sense of a desperate, "pie-in-the-sky" optimism on his part that maybe, someday things will work out his way and he will be as rich as he aspires to be.

The parties also agree that, in addition to dressing extravagantly, Mr. Sharpe lived extravagantly, flying on a

---

[6]Mr. Vaughn was not in the courtroom at the time of trial.

[7]Regarding her personal opinion of Mr. Sharpe, Ms. Wolkowitz testified that she had known Mr. Sharpe to be truthful and untruthful and that she had in her deposition described him as untrustworthy, a backstabber and a liar, but she insisted at trial that this was with regard to what she knows of him and that opinion was not reflected in her personal relationship with Mr. Sharpe.  The court affords this opinion testimony little weight, however, as it is inherently contradictory.  Moreover, Ms. Wolkowitz testified on cross that at the time of her deposition she was upset with Mr. Sharpe for various reasons so that she guessed her testimony was affected by her feelings about him at the time.  Transcript of July 17, 2006 trial, pp. 86-87, lines 24-15 and pp. 91, lines 15-25.

-12-

business associate's Lear jet, dining in expensive restaurants (often with Ms. Baker in tow), drinking expensive wines, and shopping in designer boutiques and expensive stores, such as Cartier. Ms. Baker also presented photographs to the court, Plaintiff's Exhibit 6, one showing Mr. Sharpe beside a Lear jet and one of a mansion, as evidence that Mr. Sharpe wished to portray himself as a man of significant means. The photo of Mr. Sharp beside the Lear jet was captioned, "If you haven't had the opportunity to fly on a private jet I encourage you to make enough money to do so! No matter how good you think financial freedom is......it's better!" There is no evidence as to the author of the caption, but Mr. Sharpe acknowledges that the photo appeared on his website and asserted that the photo was one of several photos that many people took on that day in order to promote their business ventures and to generate leads for people interested in home-based businesses. He emphatically asserts that the photo was not used to defraud Ms. Baker of $150,000, but for business purposes in order to project an image that he is a mover and a shaker who could get deals done. Finally, there was also undisputed testimony that Mr. Sharpe described himself on MySpace.com,[8] at some point during 2006, as "Funny guy with killer body and money to burn seeks classy woman who doesn't

---

[8]MySpace.com is a popular networking website used to, among other other things, meet people.

believe everything she reads!" Ms. Baker emphasizes the phrase "money to burn;" Mr. Sharpe emphasizes the phrase "doesn't believe everything she reads!"

Ms. Baker also recounted, as evidence of Mr. Sharpe's extravagant bent, a particular evening out with Mr. Sharpe and other friends or associates at one of the Dallas/Fort Worth area's finer steakhouses, Del Frisco's Double Eagle Steak House (Del Frisco's). Ms. Baker testified that she became familiar with Mr. Sharpe's spending habits by watching him spend money and that she knew that he would spend hundreds and hundreds of dollars on his frequent trips to Del Frisco's. Indeed, during the evening in question, Ms. Baker testified that Mr. Sharpe had ordered the most expensive bottle of wine the restaurant offered, a bottle priced at $15,000, and that Ms. Baker took it upon herself to approach the owner or manager of the restaurant to request that a less expensive bottle of wine be served instead. Upon Ms. Baker's request, a $5,000 bottle of wine was delivered for the evening's consumption.

Ms. Baker asserts that all of this evidence aggregates to show that Mr. Sharpe devised a scheme to portray himself as a wealthy man in order to con her into loaning him monies he knew he could not possibly repay. Ms. Baker represents that the clothing, the lifestyle, and all the trappings were part and parcel to Mr. Sharpe's having obtained money from her by false

-14-

pretenses, false representations, or actual fraud. The lifestyle and all that went with it, Ms. Baker asserts, were designed to fool her into believing that Mr. Sharpe was a rich fellow who could easily take out loans and repay them. Ms. Baker asserts that Mr. Sharpe knew he was not financially secure, but held himself out, in word and deed, as if he were financially secure in order to obtain loans from her.

Mr. Sharpe, on the other hand, asserts that the extravagant purchases about which he and Ms. Baker testified, were not done in order to impress Ms. Baker so that he could obtain money from her, but were simply the way he had lived his life for many, many years. He acknowledged that he lived a very extravagant lifestyle, but it was never intended to defraud people.

Further to the allegations of false representations on the part of Mr. Sharpe is Ms. Baker's testimony that Mr. Sharpe had represented to her at the time the loans were made that he was able to repay the loans because he was essentially hiding assets from his second wife, Jennifer Sharpe, in order to prevent her from obtaining her share of those assets as part of the then-pending divorce settlement.[9] Ms. Baker asserts that Mr. Sharpe told her that he had the funds to repay the loans at the time the

---

[9]Mr. Sharpe's divorce from Jennifer Sharpe was final in or about September of 2005, around the time Ms. Baker discovered that Mr. Sharpe was insolvent. Jennifer Sharpe was not present in the courtroom at the time of trial.

-15-

loans were made and that he *would* repay Ms. Baker from such funds as soon as the divorce from Jennifer Sharpe was final. Ms. Baker presented the court with no writing from Mr. Sharpe regarding this arrangement or these representations concerning his financial wherewithal to repay the loans. In connection with these allegations, the Plaintiff also elicited testimony from Ms. Wolkowitz that Mr. Sharpe put a business in Ms. Wolkowitz's name and generally wanted to avoid having things like credit cards in his name in connection with his pending divorce from Jennifer Sharpe. To the extent Mr. Sharpe represented that he had the funds to repay Ms. Baker hidden, and to the extent such arrangement to repay the loan upon the Sharpe divorce being final was made, it appears to the court that such representations and arrangements were oral and were never evidenced by a writing.

Mr. Sharpe has a very different story. While Ms. Baker asserts that Mr. Sharpe's dress, lifestyle, and demeanor were part of a scheme to defraud her (and, presumably, others), Mr. Sharpe asserts that the dress and the lifestyle were just how he lived his life and not part of some elaborate scheme. He asserted that many of the extravagant meals were business meals that were reimbursed by UltimateMatch.com and that the photos presented by Ms. Baker as evidence of his false representations were actually for promotion of UltimateMatch.com, not for self-promotion and not part of a scheme to defraud Ms. Baker. Mr.

Sharpe absolutely disputes Ms. Baker's assertion that he represented to her that he was hiding funds in order to keep them out of his divorce settlement with Jennifer Sharpe. He denies ever making such a representation.

Mr. Sharpe also strongly disputes that any repayment of the loans from Ms. Baker were at all keyed to the finality of his divorce from Jennifer Sharpe. Mr. Sharpe, instead, asserts that repayment of the loans from Ms. Baker were to be from Ms. Baker's income from UltimateMatch.com. He asserts that based upon that, she has been more than repaid. Mr. Sharpe testified, alternatively, that Ms. Baker loaned him the money based upon his ability to earn money in the future in order to repay her, not based upon money that he represented he already had. He also asserts that the repayment dates on the notes were chosen because those are the dates that he believed that UltimateMatch.com would begin operating in the black such that he would have funds to pay Ms. Baker.

Concerning his income in 2005, Mr. Sharpe testified that he was not being paid a salary, but was given loans by his business associate, Steve Smith. Mr. Sharpe testified that, at the time Ms. Baker made the loans that are the subject of this proceeding, he was receiving $20,000 in monthly "income," which he later characterized as loans from Steve Smith against commissions, such characterization being consistent with his schedules. He

-17-

testified that in 2005 he had little actual income, but received
hundreds of thousands of dollars in these sorts of loans from Mr.
Smith.  Mr. Sharpe's Statement of Financial Affairs reflects
income in the amount of $500,000 during the two years immediately
preceding the commencement of the case, but describes them as
loans from Stephen R. Smith as advances against commissions,
which is consistent with Mr. Sharpe's testimony concerning the
nature of the funds transferred from Mr. Smith to Mr. Sharpe.[10]
Mr. Sharpe's Schedule F likewise reflects a debt of unknown
amount in "advances against commission over $300,000.00," to
Soulmate - SMUM, LP.  He testified that he was paid actual
income, a base salary of $45,000 a year, from UltimateMatch.com,
in August or September of 2005 - for about two pay periods -
before he was fired on September 20, 2005.

When the court asked if he planned to repay Ms. Baker out of
the loans he received from Mr. Smith, Mr. Sharpe asserted that he
was to repay Ms. Baker by helping her build her business through
UltimateMatch.com, and also asserted that Ms. Baker made the
loans based upon his ability to earn money in the future.  Mr.
Sharpe testified that there was no writing evidencing this

---

[10]Mr. Sharpe also testified that the loans were not for the
purposes of hiding assets from Jennifer Sharpe, but were based
upon his future ability to earn, and that there was no guarantee
of salary.  Mr. Sharpe testified that Mr. Smith transferred funds
to him, and that it was Mr. Smith's idea to do so, in the form of
loans for "tax purposes."

-18-

repayment agreement with Ms. Baker.

Ms. Baker, for her part, denies that repayment of the loans was based upon her income from UltimateMatch.com, upon Mr. Sharpe helping her build her business, or upon Mr. Sharpe's ability to earn money in the future. Ms. Baker's consistent testimony throughout the trial was that she made the loans based upon her belief that Mr. Sharpe was a man of means, based upon his appearance and behavior, and, chiefly, upon Mr. Sharpe's representations that he had the funds to repay Ms. Baker hidden away pending his divorce from Jennifer Sharpe.

The court finds Ms. Baker's testimony concerning the proposed plan to repay the loans to be the most credible. The court finds it difficult to fathom that repayment of Ms. Baker's loans would be out of income from UltimateMatch.com to which Ms. Baker would be legally entitled in any event. Moreover, Mr. Sharpe's alternative testimony that Ms. Baker made the loans based upon his own future earning potential was directly contradicted by Ms. Baker and the court finds her to be a more credible witness, if for no other reason but that she has but one, consistent story regarding why the loans were made and how they were to be repaid.

This court must determine whether, based upon the foregoing facts, the $150,000 debt owed by Mr. Sharpe to Ms. Baker is nondischargeable pursuant to section 523(a)(2)(A) of the

-19-

Bankruptcy Code.   Ms. Baker also asks this court to determine whether the debt is nondischargeable pursuant to section 523(a)(6) because, she asserts, the debt results from Mr. Sharpe's willful and malicious injury of Ms. Baker by means of the alleged scheme to defraud her.

III.
<u>CONCLUSIONS OF LAW</u>

**A. Do the trappings of wealth, demeanor and an extravagant lifestyle, together with an oral representation by the Debtor that he has sufficient funds to repay a debt, rise to the level of false pretenses, false representation or actual fraud such that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)?**

"A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."   11 U.S.C. § 523(a)(2)(A). Ms. Baker is hamstrung by the last clause of this provision, which — when read in conjunction with section 523(a)(2)(B) — requires that a statement respecting the debtor's financial condition be in writing in order to result in nondischarge-ability.[11]   Ms. Baker, by her own admission, relied upon Mr.

---

[11] Section 523(a)(2)(B) precludes discharge of any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by
    (B)  use of a statement in writing—

Sharpe's *oral* representations that he had hidden away funds which were sufficient to repay Ms. Baker upon his divorce from Jennifer Sharpe. Ms. Baker, therefore, could not move under section 523(a)(2)(B) to seek nondischargeability of her debt – it requires a writing – and must move under section 523(a)(2)(A)[12] and attempt to show this court that Mr. Sharpe's *oral* representations, together with his demeanor, lifestyle and the trappings of wealth, rise to the level of false pretenses, false representation, or actual fraud under section 523(a)(2)(A) in order that this court may find her debt nondischargeable.

The standard of proof for a plaintiff in an action under section 523(a) is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995). Exceptions to discharge are construed in favor of the debtor with a view to the policy that the Bankruptcy Code provides a fresh start to debtors. *McCoun v.*

---

> (i)   that is materially false;
> (ii)  respecting a debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv)  that the debtor caused to be made or published with intent to deceive
> ....

[12] Oral statements by a debtor's insider concerning the debtor's financial condition do not fall within the scope of section 523(a)(2)(A) and, therefore, cannot form the basis for determining that a debt is nondischargeable. *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir. 1983).

*Rea (In re Rea)*, 245 B.R. 77, 84-85 (Bankr. N.D. Tex. 2000).
"But the Code does not create a haven for wrongdoers. Rather the
Code gives 'the honest but unfortunate debtor who surrenders his
[non-exempt] property a new opportunity to live unhampered by
pre-existing debt.'" *Id.* at 85 (*quoting In re Davis*, 194 F.3d 570
(5th Cir. 1999)).

In order to show a debt is nondischargeable under section
523(a)(2)(A), the creditor must show (1) that the debtor made
representations other than a statement concerning his financial
condition, (2) that at the time the debtor made the
representations he or she knew they were false, (3) that the
debtor made the representations with the intention and purpose to
deceive the creditor, (4) that the creditor justifiably relied on
such representations, and (5) that the creditor sustained losses
as a proximate result of the false representations. *In re
Acosta*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge*, 44 F.3d.
at 1293; *In re Rea*, 245 B.R. at 85; *Manheim Automotive Fin.
Serv., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr.
N.D. Tex. 2005).

False representations need not be overt. "When one has a
duty to speak, both concealment and silence can constitute
fraudulent misrepresentation." *AT&T Universal Card Services v.
Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).
Misrepresentations may also be made through conduct. *Id.*

-22-

However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'" *Provident Bank v. Merrick (In re Merrick)*, 374 B.R. 182, 186 (Bankr. M.D. La. 2006) (quoting *In re Martin*, 963 F.2d 809 (5th Cir. 1992)). Intent to deceive may be inferred from "'a reckless disregard for the truth or falsity of the statement combined with the sheer magnitude of the resultant misrepresentation.'" *In re Acosta*, 406 F.3d at 372 (citing *In re Norris*, 70 F.3d 27 (5th Cir. 1995). "Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where a debtor makes a false representation and knows or should know that the statement will induce another to act." *In re Hurst*, 337 B.R. at 133. When examining a debtor's intent under section 523(a)(2)(A), this court is charged to consider whether the circumstances in the aggregate present a picture of deceptive conduct on the part of a debtor, which betrays an intent on the part of the debtor to deceive his creditors. *Id*. Where the debtor intends or has reason to expect a creditor to act in reliance upon the debtor's representations, there is an intent to deceive on the part of the debtor. *Id*.

In evaluating a cause of action under section 523(a)(2)(A), whether it is a question of false pretenses or of false

representation or of actual fraud, the court must determine that
the plaintiff – in this case, Ms. Baker – justifiably relied upon
the representations made to her by the defendant (Mr. Sharpe,
herein).  *Field v. Mans*, 516 U.S. 59, 61 (1995).  "A person is
justified in relying on a representation of fact 'although he
might have ascertained the falsity of the representation had he
made an investigation.'"  *Id*. at 70 (quoting the Restatement
(Second) of Torts (1976)).  This is not a "reasonable man"
standard.  *Id*. at 71.  Rather, justification of the reliance "'is
a matter of the qualities and characteristics of the particular
plaintiff, and the circumstances of the particular case, rather
than of the application of a community standard of conduct in all
cases.'"  *Id*.  There are limits, however, to what is justifiable
reliance.  *Id*.  A plaintiff may not blindly rely upon a
misrepresentation, the falsity of which would be obvious to the
plaintiff had he or she used her senses to make a cursory
examination or investigation.  *Id*.  "[O]nly where, under the
circumstances, the facts should be apparent to [a person of the
plaintiff's] knowledge and intelligence from a cursory glance, or
where [the plaintiff] has discovered something that should serve
as a warning that he is being deceived, . . . is [the plaintiff]
required to make an investigation of his own."  *Id*. at 71-72
(quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).
Justifiable reliance turns upon the plaintiff's own capacity and

-24-

knowledge, or the knowledge with which the plaintiff may be
fairly charged to have from the facts within his or her
observation in light of his or her individual case. *Id*. at 72.
Justifiable reliance is a lesser standard than reasonable
reliance (which is a statutory element of section 523(a)(2)(B)),
but it does not leave reason out of the calculus:

> "As for the reasonableness of [justifiable] reliance,
> our reading of the [Bankruptcy Code] does not leave
> reasonableness irrelevant, for the greater the distance
> between the reliance claimed and the limits of the
> reasonable, the greater the doubt about reliance in
> fact. Naifs may recover, at common law and in
> bankruptcy, but lots of creditors are not at all naive.
> The subjectiveness of justifiability cuts both ways,
> and reasonableness goes to the probability of the
> actual reliance."

*Id*. at 76.

## B. Mr. Sharpe made oral verbal and nonverbal misrepresentations concerning his financial condition to Ms. Baker.

This court finds that, during 2005, Mr. Sharpe lived a
lifestyle and put forth a demeanor that suggested wealth. The
expensive clothes, the expensive dinners, the extravagant
spending, and all the rest were calculated by Mr. Sharpe to
portray himself as a successful man of means. Mr. Sharpe
characterizes this as "dressing for success" – and the court,
having spent many years in private legal practice, certainly
understands this maxim well. Ms. Baker sees a more sinister
motive, one designed to dupe her (and, one presumes, others like
her) into giving him large sums of money. The court also finds

-25-

that Mr. Sharpe's concealment of his dire financial condition
during 2005, and his, at least, vague intention to file
bankruptcy – as reflected by the so-called "bankruptcy file" –
are also misrepresentations of his financial wherewithal to repay
the loans to Ms. Baker.  But there is a problem with Ms. Baker's
argument: the clothes, food, spending habits, *et cetera* are all
false representations concerning Mr. Sharpe's financial
condition.  Patently, these do not fall within the ambit of
section 523(a)(2)(A), which specifically excludes from it
statements concerning a debtor's financial condition.[13]

These representations pale, however, in comparison to the
admitted linchpin representation to Ms. Baker: in obtaining from
Ms. Baker, at least, the two large loans aggregating $95,000 in
principal, Mr. Sharpe represented to her that he had the funds
available to repay her hidden away pending his divorce from
Jennifer Sharpe.  In fact, when questioned by her attorney
whether she made the loans in reliance upon Mr. Sharpe's
representations to her that he could repay the loans with money

---

[13]Indeed, Ms. Baker – or at least her attorney – knew there
was this very large flaw in her argument, for in the Plaintiff's
Brief in Support of Non-Dischargeability of Indebtedness Under 11
U.S.C. § 523(a)(2)(A) and (a)(6) filed with this court in advance
of trial, the Plaintiff quoted section 523(a)(2)(A), but left
out, with the convenient use of an ellipsis, the critical phrase
"other than a statement respecting the debtor's or an insider's
financial condition."  Thankfully, the court has several copies
of the Bankruptcy Code handy so it could consult the entire
statutory provision in addressing this question.

that he had set aside, which funds he did not wish to access while his divorce from Jennifer Sharpe was pending, Ms. Baker testified that her attorney's representation was "100% correct" and she added, "and only for that reason." See Transcript of July 17, 2006 trial, pages 164-65, lines 20 through 2. In other words, the key misrepresentation that induced Ms. Baker to make the loans was Mr. Sharpe's *oral* representation to her that he had the funds to repay the loans, which he was hiding from his second wife pending their divorce, and that he would repay Ms. Baker's loans from such hidden funds upon the divorce becoming final. Regardless of all of the other testimony regarding extravagant lifestyle, clothing, and demeanor, Ms. Baker's unequivocal testimony is that the key inducement to her making the loans was Mr. Sharpe's oral representations to her that he had the funds to repay her and that he would repay her from such funds.

Every representation made by Mr. Sharpe to Ms. Baker in inducement of the loans was either explicitly or implicitly a representation concerning his financial condition. As such, they cannot form the basis of a cause of action under section 523(a)(2)(A). Section 523(a)(2)(A) excepts from it the broad category of "statements respecting the debtor's . . . financial condition," and does not require that such statements be formalized financial statements. *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1060-61 (4th Cir. 1984).

-27-

Statements concerning the financial condition of the debtor are the realm of section 523(a)(2)(B). *See, e.g., Field v. Mans*, 516 U.S. at 69 (noting that the principal phrase in section 523(a)(2)(B) is "obtained by . . . use of a statement in writing"). The Tenth Circuit has set forth succinctly the policy behind requiring that statements concerning a debtor's financial condition be in writing:

> [G]iving a statement of financial condition is a solemn part of significant credit transactions; therefore, it is only natural that solemnity be sanctified by a document which the debtor either prepares or sees and adopts. In a world where important decisions relating to the extensions of credit and service will be made upon the contents of a statement relating to financial condition, too much mischief can be done by either party to the transaction were it otherwise. Somewhere in the commercial risk allocation picture, the writing must stand as a bulwark which tends to protect both sides.
>
> A creditor who forsakes that protection, abandoning caution and sound business practices in the name of convenience, may find itself without protection.
>
> *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*,

125 F.3d 1358, 1361 (10th Cir. 1997).

For these reasons, the court concludes that it cannot provide relief to Ms. Baker under section 523(a)(2)(A). Mr. Sharpe's representations, though false, all concerned his financial condition, which fall under section 523(a)(2)(B), and which requires a writing to accord relief.

However, in the event that some of the nonverbal representations by Mr. Sharpe may be considered something other

-28-

than representations concerning his financial condition for the
purposes of section 523(a)(2)(A), the court will further analyze
the elements of a cause under section 523(a)(2)(A).  This court
recognizes that there is a trend among courts to limit the
definition of the phrase "respecting the debtor's . . . financial
condition" to those false statements that "purport to present a
picture of the debtor's overall financial health.  Statements
that present a picture of a debtor's overall financial health
include those analogous to balance sheets, income statements,
statement of changes in overall financial position, or income and
debt statements that present the debtor or insider's net worth,
overall financial health, or equation of assets and liabilities."
*Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir.
2005).  Because the nonverbal representations – the lifestyle,
the demeanor, the extravagant expenditures – may not rise to the
level of statements that present a picture of the debtor's
overall financial health, the court will further examine the
elements of section 523(a)(2)(A).  But the court also finds
highly credible Ms. Baker's testimony that the primary false
representation upon which she relied was Mr. Sharpe's *oral*
representation that he had the money to repay her stashed away
pending conclusion of his divorce from Jennifer Sharpe, which
statement is unequivocally a statement concerning Mr. Sharpe's

financial condition.[14]  Similarly, Mr. Sharpe's concealment of

his financial problems from Ms. Baker also constitute non-written

statements concerning Mr. Sharpe's financial condition, which are

also not actionable under section 523(a)(2)(A).

**C.  At the time Mr. Sharpe made his false representations to Ms. Baker, he knew or should have known that they were false.**

At or around the time Mr. Sharpe made his representations to

Ms. Baker – the oral representation concerning his ability to pay

as well as the nonverbal representations by way of his lifestyle,

dress, shopping habits, and demeanor – Mr. Sharpe knew or should

have known that such representations were false.  Ms. Wolkowitz,

Mr. Sharpe's former employee and assistant, credibly testified

that during 2005, Mr. Sharpe, though he appeared to be well-off,

---

[14] Debtor's numerous oral representations that he had the ability and willingness to pay did not constitute the basis for an exception to discharge under section 523(a)(2)(A).  *Posillico v. Bratcher (In re Bratcher)*, 281 B.R. 753, 760 (Bankr. M.D. Fla. 2002).  Debtor's oral representation of "his or her ability to repay a debt respect said debtor's financial condition, which representations, by virtue of the express language of [section] 523(a)(2), are neither actionable in any event under [section] 523(a)(2)(A) nor actionable under [section] 523(a)(2)(B) unless in writing." *Commercial Money Center, Inc. v. Sacco (In re Sacco)*, 270 B.R. 382, 385 (Bankr. W.D. Pa. 2001).  *See also In re Mercer*, 246 F.3d 391, 404-05 (5th Cir. 2001) (finding, in the context of an implied representation of ability to pay by the use of a credit card, such representation "is not actionable under [section] 523(a)(2)(A)" because representations concerning ability to pay are statements respecting the debtor's financial condition and are excluded from the scope of section 523(a)(2)(A)).  The *Mercer* court noted that "[w]hen the [false] representation is confined to *intent, not ability, to pay*, there is *no* risk it will have the undesirable consequence of making the debtor a guarantor of her financial condition."  *Id*. at 405 (emphasis the Fifth Circuit's).

was in dire financial straits.  She testified that he would
instruct her not to pay certain bills as they came due.  She also
testified that certain bills were placed into a "bankruptcy
file."  While such pre-bankruptcy planning does not shock the
conscience, generally, it is evidence that at the time of his
dealings with Ms. Baker, Mr. Sharpe was at least aware that he
was in financial trouble, if not actively planning for
bankruptcy.  Mr. Sharpe does not dispute this and, in fact,
elicited testimony from Ms. Wolkowitz that, to her knowledge, Mr.
Sharpe never discussed an intention to file bankruptcy with Ms.
Baker.  Further to this point is the undisputed testimony that at
the time of his dealings with Ms. Baker, Mr. Sharpe had recently
had a home foreclosed upon and three cars repossessed.
Accordingly, Mr. Sharpe, at the time the representations as
discussed in section III.B, *supra*, were made to Ms. Baker, knew
or should have known that such representations were false.

**D.  Mr. Sharpe acted with reckless indifference to the truth and
had reason to expect that Ms. Baker would act in reliance upon
Mr. Sharpe's representations, such that there may be imputed to
Mr. Sharpe an intent to deceive.**

As set forth in section III.C. above, at the time of his
dealings with Ms. Baker, Mr. Sharpe was aware that he was in
financial difficulty.  This court finds that based upon the level
of such difficulty – *e.g.*, that he had recently gone through a
home foreclosure and the repossession of three cars – and based
upon Mr. Sharpe's pre-bankruptcy planning as reflected by Ms.

-31-

Wolkowitz's uncontroverted testimony, and by the September 6, 2005 e-mail from Mr. Smith to Mr. Sharpe concerning Mr. Sharpe's plans to file bankruptcy, Mr. Sharpe made his promise to repay Ms. Baker and lived a lifestyle that led Ms. Baker and others to believe he was a wealthy man with reckless indifference to the true matter that he was, in fact, broke. Moreover, this court finds that Mr. Sharpe knew or should have known that, based upon their very close relationship, Ms. Baker would rely on his false representations. Accordingly, intent to deceive under section 523(a)(2)(A) may be imputed to Mr. Sharpe based upon these facts.

**E. Ms. Baker sustained a loss as a proximate result of Mr. Sharpe's misrepresentations.**

Mr. Sharpe and Ms. Baker agree that Mr. Sharpe owes to Ms. Baker $150,000 in personal loans. These loans were made based upon Mr. Sharpe's misrepresentations concerning his financial condition, as set forth more fully in sections III.B. through III.D. above, such that Ms. Baker did sustain a loss as a proximate result of Mr. Sharpe's misrepresentations.

**F. The foregoing notwithstanding, Ms. Baker's reliance was not justifiable.**

**1. Ms. Baker's reliance was placed chiefly in oral representations of Mr. Sharpe concerning his financial condition, which cannot form a basis under section 523(a)(2)(A) to hold Ms. Baker's debt nondischargeable.**

First, the court reiterates that, by her own admission, as discussed in section III.B. above, Ms. Baker relied chiefly upon

Mr. Sharpe's *oral* representations that he had the funds to repay her loans hidden away pending his divorce from Jennifer Sharpe. Such representation is, as discussed in footnote 14, *supra*, a statement concerning Mr. Sharpe's financial condition, which cannot form a basis for relief under section 523(a)(2)(A).

**2.  To the extent that Ms. Baker relied upon Mr. Sharpe's nonverbal misrepresentations, such reliance was not justifiable under the circumstances and taking into account Ms. Baker's knowledge, or what knowledge can fairly be charged to her, at the time the loans were made.**

To the extent that Ms. Baker relied upon Mr. Sharpe's nonverbal misrepresentations, and to the extent that such representations do not constitute statements respecting Mr. Sharpe's financial condition such that relief may be granted under section 523(a)(2)(A), Ms. Baker's reliance was not justifiable under the circumstances.  Ms. Baker is a sophisticated woman, a woman of education, means, and maturity. She is not naive.  Bearing Ms. Baker's condition in mind, the court must examine the specific facts readily ascertainable by Ms. Baker at the time the loans were made.

Ms. Baker, through her attorney, introduced testimony that at the time the loans were made and at the time of trial, Mr. Sharpe had a drug and alcohol problem.  Although such testimony was undoubtedly introduced for the purpose of attacking Mr. Sharpe's credibility at trial, such information also affects his credibility at the time the loans were made by Ms. Baker.  If Mr.

Sharpe was not credible at trial because of his drug and alcohol problem, he was also not credible at the time Ms. Baker made the loans. Moreover, the court has accepted Ms. Baker's version of the facts concerning the repayment terms of the loans. The court believes Ms. Baker's testimony that Mr. Sharpe represented to her, falsely, that he was hiding assets from his wife, Jennifer Sharpe, in order to keep them out of Ms. Sharpe's hands by way of a divorce settlement. So was it justifiable for Ms. Baker to rely on Mr. Sharpe's representations when such representations contain an admission of untruthfulness toward his wife and, *de facto*, toward the state family court? Ms. Baker had before her evidence of Mr. Sharpe's untruthfulness in the form of his representation to her that he was hiding assets from his soon-to-be ex-wife. Yet she chose to ignore this evidence of admitted falsehood (doubly ridiculous after the fact, since it turns out to be a falsehood about a falsehood), blithely believing that, although Mr. Sharpe would so brazenly deceive Jennifer Sharpe in the divorce proceeding by hiding assets, he would not in the same breath also deceive Susan Baker. Moreover, the court believes that, at least at some point before all of the various loans were accomplished, Ms. Baker was onto Mr. Sharpe and knew he was financially unstable. On that fateful night of the $15,000-turned-$5,000 bottle of wine at Del Frisco's, the court notes that it was Ms. Baker herself who changed the order in an effort

-34-

to stem the tide of Mr. Sharpe's extravagant spending. Had Ms. Baker truly believed that Mr. Sharpe was flush with cash – had she relied on his nonverbal representations of wealth and success – there would have been no need for Ms. Baker to change Mr. Sharpe's wine order. She would have assumed that he was good for it, as she represented to this court that she assumed he was good for the loans she made him. Too, Ms. Baker testified that there were times when Mr. Sharpe stuck her with the bill for extravagant meals because Mr. Sharpe had forgotten his credit card or otherwise. Taking into account Ms. Baker's status as a sophisticated woman, the facts were there before her and readily ascertainable that all was not right with Mr. Sharpe. The standard of justifiable reliance requires that the Plaintiff, Ms. Baker, need not to undertake an extensive investigation of the facts, but she must use her senses. She may not blindly rely upon Mr. Sharpe's misrepresentation, "the falsity of which would [have been] patent to [her] if [she] had utilized [her] opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. at 71. Ms. Baker is not naive, and her blind reliance upon representations by Mr. Sharpe in the face of facts that should have made her wary was not justified.

**G. Since Mr. Sharpe's actions are not excepted from discharge under section 523(a)(2)(A), do they constitute grounds for a determination that Ms. Baker's debt is nondischargeable under section 523(a)(6) for willful and malicious injury?**

"A discharge under section 727 . . . of [the Bankruptcy

-35-

Code] does not discharge an individual debtor from any debt for
willful and malicious injury by the debtor to another entity or
to the property of another entity." 11 U.S.C. § 523(a)(6). "The
word 'willful' in (a)(6) modifies the word 'injury,' indicating
that nondischargeability takes a deliberate or intentional
*injury*, not merely a deliberate or intentional *act* that leads to
injury. Had Congress meant to exempt debts resulting from
unintentionally inflicted injuries, it may have described instead
'willful acts that cause injury.'" *Kawaauhau v. Geiger*, 523 U.S.
57, 61 (1998) (emphasis the Court's). The debtor/actor must
intend the consequences of his action, not merely the act itself.
*Id*. at 61-62. "[D]ebts arising from recklessly or negligently
inflicted injuries do not fall within the compass of [section]
523(a)(6)." *Id*. at 64. Following the Supreme Court in *Kawaauhau
v. Geiger*, the Fifth Circuit determined that either an objective
substantial certainty of injury or a subjective motive to cause
injury meets the Supreme Court's definition of "willful" in
section 523(a)(6). *Miller v. J.D. Abrams, Inc. (In re Miller)*,
156 F.3d 598, 603 (5th Cir. 1998), *cert den'd* 526 U.S. 1016
(1999). Indeed, the injury must be deliberate; reckless
disregard is not enough for a debt arising from injury to another
to be nondischargeable. *Kelt v. Quezada (In re Quezada)*, 718
F.2d 121, 122 (5th Cir. 1983). But the injury to another must
not only be "willful" it must be "malicious." "'[M]alicious'

-36-

means without just cause or excuse." *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 486 (5th Cir. 1986). "An injury to an entity or property may be a malicious injury within [the meaning of section 523(a)(6)] if it was wrongful and without just cause or excuse, even in the absence [of] personal hatred, spite or ill-will." *Federal Deposit Insurance Corp. v. LeFeve (In re LeFeve)*, 131 B.R. 588, 602 (Bankr. S.D. Miss. 1991). "[W]here an act is deliberately and intentionally done with knowing disregard for the rights of another it falls within the statutory definition of malice even if there is an absence of malice toward the particular creditor." *Id.*

While Mr. Sharpe acted with reckless disregard for the consequences of his actions, the court finds that Mr. Sharpe did not intend to injure Ms. Baker when he took the loans from her. Mr. Sharpe's testimony was consistent that, at the time Ms. Baker loaned him the money, he believed that he would soon be making large sums of money via the UltimateMatch.com venture. Indeed, the $20,000 a month draws against future commissions he was receiving from Mr. Smith would be sufficient to create such an expectation in Mr. Sharpe. Ms. Wolkowitz testified, in effect, that Mr. Sharpe often dreamed big and had a sincere motive to follow through on those dreams, but often fell short. The court concludes that although Mr. Sharpe may have induced Ms. Baker to make loans by falsely claiming that he had the funds to repay her

-37-

hidden away pending his divorce (and/or by portraying himself as a wealthy man), he nevertheless believed that he would, somehow, be able to repay Ms. Baker.  He testified that the loan repayment dates were keyed to times when he believed or expected that UltimateMatch.com would be cash flow positive, and the court finds that Mr. Sharpe genuinely believed that his internet dating business scheme would make him a rich man.  The court finds that Mr. Sharpe was reckless in his injury to Ms. Baker; the injury was not intentional and, therefore, was not willful.

As the court has determined that the injury was not willful, the court need not address whether the injury was malicious – that is, lacking just cause or excuse.  However, in the interest of completeness, the court is also of the opinion that the injury was not malicious.  Mr. Sharpe and Ms. Baker both testified that, with regard to at least one of the loans, the money was to be used for the purposes of promoting UltimateMatch.com, and Mr. Sharpe's uncontroverted testimony is that at least part of the funds were so utilized.  Mr. Sharpe did not have an evil motive in taking the loans from Ms. Baker, but rather acted recklessly upon his eternal optimism, which had the unfortunate result of causing a financial loss to Ms. Baker.

V.
CONCLUSION

For the foregoing reasons, Plaintiff's $150,000 debt is found to be dischargeable pursuant to section 523(a)(2)(A) and

523(a)(6) of the Bankruptcy Code. This court hereby rules in favor of the Defendant and a separate judgement will be entered consistent with this opinion.

###END OF MEMORANDUM OPINION###